## Alvin Brown v. The State.

### No. 4164. Decided December 9, 1908.

**1.—Forgery—Constitutional Law—Jury Wheel—Jury and Jury Law.**

The Act of the Thirtieth Legislature, commonly called the jury wheel law, and relating to the selecting of grand and petit juries is constitutional. Following Smith v. State, 54 Texas Crim. Rep., 298.

**2.—Same—Evidence—Contradicting own Witness.**

Under article 795 White's Code Criminal Procedure, a party may attack the testimony of his own witness in any other manner except by proving the bad character of the witness; the State therefore upon trial for forgery had a right to show its witness had made statements contradictory of his testimony on the witness stand; but such testimony was only admissible for the purpose of affecting the credibility of said witness.

**3.—Same—Insufficiency of Evidence.**

Upon trial for forgery where the State's testimony established the fact that the making of the alleged forged check and passing the same was with the authority of the alleged injured party, the same was insufficient to support a verdict for fraudulently passing the alleged forged instrument.

Appeal from the District Court of McLennan. Tried below before the Hon. Richard I. Munroe.

Appeal from a conviction of passing a forged instrument; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

No brief on file for appellant.

*F. J. McCord,* Assistant Attorney-General, for the State.

RAMSEY, JUDGE.—This is an appeal from a conviction for forgery. The indictment charges that the appellant in the county of McLennan

on the 12th day of December, 1907, did with intent to injure and defraud, wilfully and fraudulently make a false instrument in writing purporting to be the act of one H. J. Barnhart, being in the nature of a check drawn on the First National Bank for fifty dollars, payable to the order of one John Drew. In the second count he was charged with passing a forged instrument. Both counts were submitted to the jury in the court's charge and the jury convicted the defendant for passing the said forged instrument.

There are several questions presented in the record, the first being a motion to quash the venire, said jury having been drawn under the Act of the Thirtieth Legislature, commonly called the jury wheel law. This Act of the Legislature is attacked as unconstitutional. Under the authority of Smith v. State, not yet reported the constitutionality of this law has been upheld by this court and we have no reason to change our views on this subject and we deem it unnecessary to further express our views on the constitutionality of this Act of the Legislature. And while there are several other questions presented by the record the conclusion that we have reached in this case renders it unnecessary to pass upon these questions.

Appellant in his motion for new trial complains that the verdict of the jury is contrary to the law and the evidence and that if appellant did sign the name H. J. Barnhart to the check on the bank it was by authority of said Barnhart and therefore he was neither guilty of forging said instrument or of fraudulently and with intent to injure, passing said instrument. The testimony of Barnhart is as follows:

"My name is H. J. Barnhart. I live out five miles southeast of Mart, in Limestone County. I know the defendant Alvin Brown. He is my brother-in-law. The defendant was visiting at my house in December, 1907. He visited me four or five days. I married his sister. I do not know where the defendant lives now. In December, 1907, when he visited me, he lived at Brownwood, Texas. He came from Brownwood to my house. In December, 1907, I was doing my banking business in Mart at the First National Bank. Alvin Brown, the defendant, was in said bank with me the day I had sold some cotton; he came into the bank with me. I had not sold it at the time he was in the bank. Right then I was trying to sell it, and the buyers were looking at the samples. My name is signed to the check which is now shown me. I did not sign said check. I don't know who did sign it. I did not give the defendant permission to sign said check. If the defendant signed this check he signed it without my authority. *Cross-examination—* The defendant had been staying at my house about four or five days. I came with him to Mart the day this check which has been shown me was drawn. We came to Mart on horseback. We reached Mart between nine and ten o'clock, I suppose—something

like that. I stayed in Mart long enough to get my horse shod. I took back home the horse that the defendant had ridden into Mart. I live four or five miles from Mart. In going from Mart to Thornton by regular traveled way, one road would go about 150 yards from my house, and the other would be about a mile and a half from my house. The roads are about the same distance from Mart to Thornton. The defendant was expecting to get some money by mail on the train that day when we got to Mart. The defendant and I were talking about the money the night before that day. I told him if he did not get the money on the train at Mart that I would let him have some money. The train on which the defendant was expecting to get his money came in after I left Mart. It came along about one o'clock, I reckon; it was some time in the afternoon, I think. If I had been present when the defendant drew the check I would have made no objection. It was all right with me. I received a message from some official of the bank after this check was cashed. When I received the notification from the bank I did not know whose check they were referring to then. The bank phoned me to know whether or not I had given a check to anybody for fifty dollars, and I told them I had not. I did not know that it was the defendant's check. If they had told me the check was drawn by the defendant I would have told them it was all right, and to cash it. I went to Mart late that evening after the check was drawn. I first found out that the defendant had drawn the check after I got to Mart. I do not remember who told me. It was at the bank in Mart that I first found out the defendant had drawn the check. The money was paid back to the bank and the bank lost nothing. It was replaced to my credit at the bank by the defendant himself, and I lost nothing. I lost nothing. The bank lost nothing. Nobody has been injured or defrauded, and if the bank had put me in possession of the facts as they were, I would have told them to go ahead and cash the check, that it was all right. I have known the defendant since he was a little bit of a fellow. His father is dead. He has stayed at my house a great deal, made my house his home and worked for me. It was the understanding with the defendant the night before we went to Mart that if. he did not get the money he expected on the train I would let him have some money. We were talking about it the night before, and I told him if he did not get his money I would let him have some. *Redirect Examination.*—I testified in this case once before. I was also before the grand jury. I did not tell the grand jury anything about the agreement I had with the defendant to let him have this money; I did not say a word to the grand jury about that; the grand jury did not ask me about it. I knew what the grand jury were investigating. I did not tell them about the agreement to let the defendant have the money because they did not ask me. The defendant had not been at my house prior to

this visit for about four or five years—four years. My statement was correct that the defendant had made his home at my house; he left there about four years ago. He worked for me some and he had been at my house several times. I said we got to Mart somewhere between nine and ten o'clock that morning; I do not remember exactly the time. As to the conversation the defendant and I had the night before, about lending him some money—we were talking about money, and he told me he was expecting some money from his brother. He did not say how much he was expecting. He made no suggestion to me as to the amount he was looking for, nor as to the amount of money he would probably want from me. I told the defendant at that time I would let him have some money if he did not get it. I did not say how much and he did not say how much. From Mart the defendant was going to Thornton. He did not say how he was going to Thornton. He was talking some about going out on a hack when I left. I live sort of between Mart and Thornton. I do not remember whether it was my testimony before that I brought the defendant to Mart to take the train to go to Thornton. I brought him to Mart, but I did not know whether he was going to take the train or not. I last saw the defendant in Mart that morning at the blacksmith shop. When I left him I told him good-bye. I was not expecting him to go back home with me. When I left him at Mart I reckon we had been together there something like an hour or hour and a half. During that hour or hour and a half the defendant did not report to me whether or not he had gotten the money; he did not say anything to me about it, and I did not say anything to him about it. When the bank phoned to me about this check they did not tell me over the phone that my brother-in-law had cashed a fifty dollar check there, and asked me if it was all right. Q. On the former trial of this case was not this question asked you. 'Question. Didn't the bank tell you that your brother-in-law had cashed a fifty dollar check there? Answer. Yes, sir. Question. Didn't they say that they paid him fifty dollars? Answer. Yes, sir.' Did you so testify or not on the former trial of this case? A. Mr. Neff, you had me so hoodooed that day until I could not say what I did say. I just could not tell you. You had me so rattled until I don't know what I did say. If the county attorney means to ask if they did not tell me that over the phone, they never told me that over the phone. They told me about it after I got to the bank, and there I found out it was my brother-in-law. I do not remember what I replied when they told me at the bank. If I told A. P. Smythe and E. M. Parks, when they told me that my brother-in-law had cashed a check there, that I didn't know anything about it, but if I had known he was broke I would have let him have money enough to go home on, I do not remember anything about it. I could not testify now to save my life what I testified about on the former trial,

The bank asked me over the phone had I given a check there for fifty dollars. They told me that the young man that was there with me had cashed it. There were two young men with me in the bank at the time they referred to. Q. Was not this question asked you on the former trial: 'Isn't it a fact that you are wanting to ratify and pay over this money and get this matter out of court just simply because you do not want your brother-in-law to go to the penitentiary?' Answer. 'Yes, sir.' (The defendant objected to the question because it is immaterial and there is no question of ratification at issue here. The objection was overruled and defendant excepted.) Q. Mr. Barnhart, that question was asked you and you answered it in the affirmative. That is what you were testifying for, isn't it? A. Yes, sir. Q. And that is what you are testifying now for, isn't it, just simply to keep him out of the penitentiary? A. No, sir; no, sir. Q. I will just ask you the question now, if you are not wanting to ratify or pay over this money and get this matter out of court, just simply because you do not want your brother-in-law to go to the penitentiary. What is your answer to that now? A. No, sir; I do not believe he is guilty. I wrote to Mr. Walling, who married the defendant's sister at Thornton, a letter after the defendant had left my house. I did not say in said letter that the defendant had forged my name to either a check or a note. The night I had the conversation with the defendant about letting him have some money he did not say what he wanted with the money. I do not remember that I testified on the former trial as follows: 'Answer. He said he wanted to borrow some money. Question. To borrow some money? Answer. Yes, sir. Question. What for? Answer. He said he wanted to go home and wanted to borrow some money.' If I testified as above stated I do not remember it. There was not anything said in regard to that in our conversation that I know of. I am not embarrassed now, and I think I understand everything now. I do not remember that on the former trial I testified as follows: 'Question. He then did tell you he wanted to borrow some money to go home on? Answer. Yes, sir; he told me he wanted to borrow some money to go home on.' The defendant's name is not on the check anywhere which was shown to me here. If some months after that I had come across this check payable to the order of John Drew and endorsed by John Drew and the bank told me that my brother-in-law got the fifty dollars, I would have paid the bank. I do not remember anything about what I answered to that on the other examination. It would not refresh my memory any to read the question and answer. I had never loaned the defendant any money before this. I came to Mart right away when the officers of the bank phoned me about the check. I had a conversation with E. M. Parks and A. P. Smythe in regard to this check. They said the boy that had been in the bank with me had passed the check. I do not

remember they used the words, 'that my brother-in-law had passed the check,' or not. I did not in reply to them that I remember, tell them that I would have let him have a little money to go home on if I had known he was broke, but I would not have let him have anything like fifty dollars. I do not remember telling them that. I do not remember anything about it at all. I could not say anything I said to them at all. I am employing attorneys to defend my brother-in-law, the defendant. I feel a right smart interest in the case. I do not own my farm. I am a tenant. I do not remember that on the former trial I testified as follows: 'Question. Didn't the bank tell you that your brother-in-law had cashed a fifty dollar check there? Answer. Yes, sir; they said he presented a check there. Question. Didn't they say they paid him fifty dollars? Answer. Yes, sir.' As a fresh, independent fact the bank did not tell me that and I did not answer that way, not that I remember of at all."

The above is practically the testimony upon which the State relied for a conviction. The State was permitted over the objection of the defendant to attack the testimony of the principal State's witness. We think, however, the State had this right under article 795 of White's Annotated Code of Criminal Procedure, which is as follows: "The rule that a party introducing a witness shall not attack his testimony is so far modified as that any party when the facts stated by the witness are injurious to his cause, may attack his testimony in any other manner except by proving the bad character of the witness." Under the provisions of this article, we are of opinion that the State had a right to contradict the witness Barnhart and to show that he had made statements contradictory of his testimony on the witness stand. However, this testimony was only admissible for the purpose of affecting the credibility of the witness and this testimony could not be used for the purpose of proving, or tending to prove any material fact necessary for the State to establish in order to convict, and when the testimony offered in the trial of the case is analyzed and stripped of the statements made by the witness contradictory of his testimony on the stand, it fails to make out a case against the appellant. We are, therefore, constrained to hold that the testimony was not sufficient and that the State's testimony established that the making of said check and the passing of same was with the authority of Barnhart, and this being so, the case will therefore have to be reversed. We hold that the court below erred in not granting a new trial because the evidence was insufficient to support the verdict.

For the error indicated the case is reversed and cause remanded.

*Reversed and remanded.*